IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEBRA EATON,

                                         OPINION AND ORDER

            Plaintiff,

                                            19-cv-282-bbc

    v.

J.H. FINDORFF & SON, INC.,

            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Debra Eaton contends that she was not hired as a forklift operator in 2017 and 2018 by defendant J.H. Findorff & Son, Inc. because of her sex and previous complaint of employment discrimination against defendant, and that this failure to hire her violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the court is defendant's motion for summary judgment. Dkt. #10. Because I conclude that plaintiff has waived her sex discrimination claim and failed to present evidence from which a reasonable jury could conclude that defendant would have rehired her but for her protected conduct, I am granting defendant's motion for summary judgment and closing this case.

From the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted.

UNDISPUTED FACTS

A. The Parties

Plaintiff Debra Eaton is a female resident of Milwaukee County, Wisconsin and a member of the International Union of Operating Engineers Local 139. Defendant J.H.

1

Findorff & Son, Inc. is a union contractor and construction company based in Dane County, Wisconsin.

### B. Plaintiff's 2011 Employment

Defendant was the general contractor and the primary construction company directing the 2011 and 2012 construction of The Moderne, a 30-story high-rise in Milwaukee, Wisconsin. In March 2011, plaintiff was dispatched to The Moderne construction site to work as a telehandler (large forklift) operator for defendant. At the conclusion of plaintiff's first day as a telehandler operator, Mark Szymkowski, defendant's on-site project superintendent, told plaintiff that she was being laid off because she was not able to adequately perform the job functions of that position. Szymkowski believed that she was operating the forklift in an unsafe manner and that she did not have the training to operate it correctly. Mark Schneider, defendant's general superintendent, learned from Szymkowski that plaintiff was "slow and dangerous" on the forklift.

In March 2011, Local 139 filed a grievance on plaintiff's behalf, alleging that plaintiff had been discharged from the telehandler operator position without just cause after only one shift. Szymkowski told plaintiff that he and Schneider agreed that defendant would put her on the skip hoist (a construction-type elevator located on the outside of a building for transporting people and materials) after it was installed at The Moderne project.

In August 2011, defendant re-hired plaintiff to operate the skip hoist. Among other things, plaintiff was responsible for picking up trash that accumulated on the floors during

the construction process. In a September 2011 on the job training report, Szymkowski rated plaintiff's job performance in operating the fork lift as "below average." Szymkoski gave plaintiff "average" ratings on operation of the skip hoist so that he would not have to lay her off and fall out of compliance with Milwaukee County quota requirements. (According to Szymkoski, the City of Milwaukee requires a certain percentage of underemployed Milwaukee County individuals to work on the crew, and plaintiff qualified as such an employee.)

### C. Plaintiff's Layoff and Discrimination Complaint

Plaintiff was laid off between January 2 and 6, 2012. When the night shift on The Moderne project ended, defendant was left with an extra skip hoist operator. According to Szymkowski, defendant had each of the operators take a week off in order to keep everyone employed, and January 2 was the start of plaintiff's week. Two male employees continued working during plaintiff's week off.

Plaintiff filed a charge with the Equal Employment Opportunities Commission on January 27, 2012, alleging that defendant discriminated against her on the basis of sex when it laid her off on January 2 and replaced her with a male employee. She also filed her complaint with the Department of Workforce Development Equal Rights Division. Plaintiff never complained in writing to any employee of defendant about sex discrimination or retaliation. In its response to the complaint, defendant explained that plaintiff was part of a group of operators who were laid off on a rotating basis in order to minimize the adverse

impact on any one individual employee. The Equal Rights Division dismissed plaintiff's complaint after she failed to provide a written response to defendant's explanation.

### D. Plaintiff's Continued Employment in 2012

Szymkowski documented performance issues in daily logs and layoff slips. (Although plaintiff raised a hearsay objection to the content of Szymkowski's daily logs that defendant produced, defendant has authenticated that document with Szymkowski's declaration.) He does not remember filling out any lay off slips for plaintiff, but his logs state that he had a conversation with plaintiff on January 23, 2012 about her performance in running the skip hoist too slowly and complaints that he received about her missing pickups. Szymkowski recalls that plaintiff was "very slow" in her operation of the skip hoist and even though defendant trained her with a number of operators, she did not progress to the point where she was capable of meeting some of the expectations defendants expects of journeyman operators as far as speed and ability to help others with the material. According to plaintiff, Szymkowski told her on January 23 that the other operator was faster and that she "creep[s] up to the floors and that [she] did not have to stop exactly level with the floors" and that she "ha[s] to keep the hoist moving." Symkowski also had concerns about plaintiff's picking up people because she "seemed to skip floors, people get frustrated, [and there were] a lot of complaints from people." Dkt. #17 at 40. He observed plaintiff's performance issues throughout the duration of her work at The Moderne site, but he believed that the issues were more pronounced during the latter half of the job as more floors were added.

4

After her conversation with Szymkowski on January 23, plaintiff began keeping handwritten notes. Her notes confirm that Szymkowski spoke with her about her slow speed in operating the skip hoist and complaints that had been made about her performance. Plaintiff understood that she was to assist in transporting trash as part of her job responsibilities but admitted to sometimes not emptying the trash when asked to do so by various subcontractors.

Around January 24, 2012, plaintiff had an altercation with an ironworker (not employed by defendant), who questioned why plaintiff was not stopping at every floor. After plaintiff told the ironworker to mind his own business, she believed that the ironworker was going to "get in her face," so she closed the door to the lift and continued to move to a different floor. When she returned to the ground floor, she told Szymkowski about the interaction and stated that she felt threatened and would not allow the ironworker to ride the skip hoist while she was operating it until he apologized to her.

Defendant's safety director and compliance officer, Sonny Femal, investigated the incident and learned that plaintiff had refused to allow the ironworker to ride in the skip hoist on at least two occasions. Even though no supervisor had told plaintiff that refusing workers on the skip hoist was allowed or acceptable, plaintiff believes that she was entitled to decide which workers on the job site had the right to ride on the skip hoist. On February 27, 2012, plaintiff met with Szymkowski, Schneider, Femal, union agents Greg West and Tim Goetz and the ironworker's supervisor. Szymkowski told plaintiff that it was her responsibility to "service all the trades, all the people" on the skip hoist. Plaintiff refused to

5

accept the ironworker's apology. During a private conversation with plaintiff on February 27, West (plaintiff's union representative) told plaintiff that he did not believe that the ironworker's conduct had been threatening. Plaintiff returned to the meeting and agreed to pick up the ironworker in the future, but she refused to accept his apology.

When asked at his deposition whether he ever found plaintiff's work acceptable on The Moderne project, Szymkowski testified that

> At the end she was getting a lot better. It wasn't the most efficient, but for our job, it worked. I would have liked to seen better, acceptable. The only caveat I have with acceptable is there was a city requirement for underemployed Milwaukee County individuals to be working with us as a percentage of the crew and Debra was that, . . . we kind of work with those people just to get them through. Because every one of the quota people I lay off, I got to lay off two unquota people. So it was important that I made Debra Eaton . . . work for us.

Dkt #17 at 49-50. Plaintiff continued working for defendant until August 30, 2012, after which defendant no longer needed an elevator operator.

### E. Plaintiff's 2017 Application

In June 2017, plaintiff heard from Louis Rupert, a laborer for defendant, that defendant had an open position for an operating engineer. Soon thereafter, plaintiff spoke with Jeff Tramel, the superintendent on the site where Rupert worked, who told her to speak with Schneider. Even though Schneider told plaintiff over the telephone that there was no open position, plaintiff dropped off her résumé with the receptionist at defendant's office, telling the receptionist that she was applying for a position as an operating engineer.

6

Samantha Garni worked as an administrative assistant for defendant in 2017, and she helped people find jobs with defendant. She remembers plaintiff submitting an application for an operator position, but it was her understanding that there was no opening for this position even though defendant was performing work on projects in Milwaukee in 2017. Because Garni noticed that plaintiff's application stated that she had worked previously for defendant on The Moderne site, she asked Szymkowski if he would hire plaintiff again. Szymkowski told Garni that he would not recommend plaintiff or hire her. Workers who are recommended by a former supervisor typically go to the top of defendant's list.

### F. Plaintiff's 2018 Application

On April 9, 2018, Garni contacted Guy Yuker at Local 139 about filling an operator position for defendant. When Yuker told Garni that he would dispatch plaintiff to defendant's job site, she stated that she did not think that defendant was supposed to hire plaintiff. In light of her conversation with Szymkowski in 2017, Garni told defendant's field operations specialist, Kim Norton, that it was her understanding that plaintiff should not be dispatched to work for defendant.

Norton discussed plaintiff's prospective employment with Schneider and Szymkowski. Szymkowski told Norton that he thought that plaintiff was a "subpar" skip hoist operator, that defendant had better operators to choose from and that defendant probably should look for someone else. When Norton called Yuker to rescind plaintiff's job offer and ask for another operator, Yuker told her that defendant would need to provide a

letter stating why it did not want to hire plaintiff. In a letter to the union dated April 9, 2018, Norton stated: "Please do not send Operator Debra Eaton to any job for J.H. Findorff & Son, Inc. There have been past issues with her performance." Dkt. #20-1. Defendant typically sends such letters to unions before the union refers the employee to a job with defendant. This is also a common industry practice.

Schneider knew that plaintiff had filed a union grievance about being laid off after one shift in 2011, but he did not know about her 2012 discrimination complaint. Norton is not aware of anyone filing a discrimination complaint against defendant. Szymkowski knew that plaintiff had filed a grievance regarding her 2012 layoff, but he did not know that it was a discrimination complaint or that she had complained about being mistreated because of her sex.

# OPINION

## A. Summary Judgment Standard

The court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To avoid summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Id. The non-moving party may not simply rely on the allegations in its

pleadings to create a genuine dispute but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor[.]" Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir. 1996). "[S]ummary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003) (quoting Schacht v. Wisconsin Dept. of Corrections, 175 F.3d 497, 504 (7th Cir. 1999)).

### B. Plaintiff's Claims

In her complaint, plaintiff alleges that defendant violated Title VII by failing to hire her in 2017 and again in 2018 because of her sex and in retaliation for her filing a complaint about sex discrimination in 2012. Defendant contends that (1) plaintiff has no evidence that her sex motivated its decisions not to hire her in 2017 or 2018; (2) there was no open position in 2017 for which defendant could have hired plaintiff; (3) no one involved in the 2018 decision not to hire plaintiff knew about her 2012 discrimination complaint; and (4) plaintiff has no evidence to refute defendant's assertion that it did not hire her in 2018 because of her past performance problems. In response, plaintiff has filed a cursory, five-page brief, in which she fails to address defendant's arguments regarding her sex discrimination claim or present any evidence or argument in support of that claim. Because plaintiff seems to have abandoned her sex discrimination claim, Nichols v. Michigan City Plant Planning Dept., 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives

9

any arguments that were not raised in its response to the moving party's motion for summary judgment."), defendant is entitled to summary judgment with respect to that claim. I will address plaintiff's remaining retaliation claim below.

1. Legal standard

Title VII prohibit employers from retaliating against employees for opposing discrimination. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e-3(a). To prove retaliation, plaintiff must adduce sufficient evidence that: (1) she engaged in a statutorily protected activity; (2) defendant took materially adverse action against her; and (3) there is a causal connection between the activity and the adverse action. Baines v. Walgreen Co., 863 F.3d 656, 661 (7th Cir. 2017). The causation standard is more stringent for a retaliation claim than for a discrimination claim. University of Texas Southwest Medical Center v. Nassar, 570 U.S. 338, 360 (2013). To succeed on a Title VII retaliation claim, a plaintiff must show that the defendant would not have taken the adverse action *but for* the protected activity, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id.

In evaluating Title VII claims at summary judgment, courts have historically toggled between the so-called "direct" and "indirect" methods of proof, depending on the nature of the evidence presented. Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 763 (7th Cir. 2016). In Ortiz, the Court of Appeals for the Seventh Circuit explained that the different methods have "complicated and sidetracked employment-discrimination litigation for many

years" and instructed district courts to consider the evidence "as a whole," focusing on the appropriate legal standard on summary judgment, which "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the . . . adverse employment action." Id. at 764-65. (Although defendant discusses both the direct and indirect methods of proof in analyzing plaintiff's claim, it agrees the standard outlined in Ortiz is appropriate. Plaintiff does not say which method of proof she relies on.)

2. Protected activity and adverse action

The parties do not dispute that plaintiff's filing of a sex discrimination charge in 2012 was a protected activity. With respect to adverse employment action, defendant argues that plaintiff cannot rely on the fact that she submitted an application in June 2017 because there was no open position for which defendant could have hired plaintiff at that time. (Although plaintiff points out that defendant was working on projects in Milwaukee in 2017, there is no evidence that there were open positions at any of those job sites.) Plaintiff suggests that even if there were no job openings, it is undisputed that Szymkowski told Garni not to hire plaintiff in the future. Plaintiff cites Burlington Industries, Inc. V. Ellerth, 524 U.S. 742, 761 (1998), in support of her contention that actions that pose no immediate consequence but potentially harm future employment prospects may be adverse employment actions. However, the discussion in Burlington cited by plaintiff does not support her

11

contention because it addresses only an employer's vicarious liability for sexual harassment committed by a supervisory employee that results in a tangible employment action.

An adverse employment action is typically "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." Lewis v. City of Chicago, 496 F.3d 645, 653 (7th Cir. 2007). See also Chicago Teachers Union, Local 1 v. Board of Education of City of Chicago, 419 F. Supp. 3d 1038, 1046 (N.D. Ill. 2020) (holding same). No significant change occurred in plaintiff's employment status in 2017 because there was no position for which she could apply at that time. Although it is undisputed that Smyzkowski stated that he would not hire plaintiff again, "there is ample precedent . . . supporting the proposition that an adverse action in the Title VII retaliation context must produce a material injury or harm, and that unfulfilled threats do not meet that standard." Lewis v. Wilkie, 909 F.3d 858, 870 (7th Cir. 2018). See also Ajayi v. Aramark Business Services, Inc., 336 F.3d 520, 531 (7th Cir. 2003) ("unfulfilled threat, which results in no material harm, is not materially adverse").

In any event, there is no dispute that plaintiff suffered at least one adverse employment action: defendant's failure to hire her in 2018. Therefore, the main issue is whether there is a causal connection between her 2012 complaint of sex discrimination and defendant's failure to rehire her in 2018.

3. Causation

Defendant argues that none of the four employees involved in the decision not to hire plaintiff in 2018 knew that plaintiff had filed a charge of discrimination in 2012 when they refused to rehire her. It is undisputed that Garni, Norton and Schneider did not know about the discrimination complaint. Although plaintiff points out that Szymkowski knew she had complained about being laid off, she has failed to present any evidence that he knew she had complained about sex discrimination. However, even if there is room for interpretation as to what Szymkowski knew about plaintiff's complaints or grievances, plaintiff has failed to present sufficient evidence from which a reasonable jury could infer that the complaint factored into his recommendation that defendant not hire plaintiff.

Defendant has offered legitimate, nonretaliatory reasons for its decision not to hire plaintiff in 2018: her performance problems in 2011 and 2012. To show that a reason is pretextual, a plaintiff "must present evidence suggesting that the employer is dissembling." O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011). "To meet this burden, [plaintiff] must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [defendant's] asserted reason 'that a reasonable person could find [it] unworthy of credence.'" Id. (citations omitted). Plaintiff fails to meet this standard.

Plaintiff makes only two arguments in an attempt to show that defendant's reasons for not hiring her were pretextual. First, she argues that there is sufficient evidence that her job performance was satisfactory. However, the only evidence that plaintiff presents in support of her contention is Szymkowski's deposition testimony about whether he ever found plaintiff's work acceptable. It is undisputed that Szymkowski testified that "[a]t the

13

end she was getting a lot better. It wasn't the most efficient, but for our job, it worked. I would have liked to seen better, acceptable." A reasonable jury would not conclude from this testimony alone that plaintiff was meeting all of Szymkowski's expectations and that he would rehire her in the future.

It is undisputed that Szymkowski had problems with how plaintiff operated the forklift in 2011 and the skip hoist in 2012 and informed both plaintiff and Schneider about his concerns at the time. There was nothing "fishy" or "suspicious" about Szymkowski's concerns because he raised them before plaintiff filed her discrimination complaint on January 27, 2012, and well before defendant decided not to rehire plaintiff in 2018. Although plaintiff may disagree with defendant's conclusion about the extent or significance of her past performance issues or whether they warranted its decision not to rehire her, the court's role is to prevent unlawful hiring practices, not to act as a "super personnel department" that second-guesses an employer's business judgments. Millbrook v. IBP, Inc., 280 F.3d 1169, 1181 (7th Cir. 2002). "[J]udgments regarding the fairness of a particular action or the accuracy of an employer's belief about an employee's job performance have no place in determining whether the employer acted based on an improper motive." Lauth v. Covance, Inc., 863 F.3d 708, 717 (7th Cir. 2017) (internal citation omitted). The only question that matters is whether defendant believed it had a legitimate reason to not hire plaintiff. Id. In this case, a reasonable jury would conclude that defendant believed that plaintiff's past performance problems qualified as a legitimate reason not to rehire her.

In her second argument, plaintiff points out that defendant departed from its usual practice by not alerting the union to her deficient performance until 2018, and that the letter Norton sent about plaintiff differed from letters that defendant sent with respect to other union workers. The fact that defendant did not notify plaintiff's union earlier about its reasons for not wanting plaintiff to return does not necessarily mean that it acted with a discriminatory motive. As discussed above, it is undisputed that defendant had specific concerns about plaintiff's performance as early as 2011. Although plaintiff seems to suggest that she was treated differently from other union workers, she fails to present sufficient evidence to support her contention or develop her argument in any meaningful way. For example, she does not identify any other union employee who was treated differently, attempt to show that these other employees are outside her protected class and similarly situated to her or provide any details about their particular circumstances or treatment. Therefore, defendant's allegedly different treatment of other union employees offers no support for a finding that it treated plaintiff in a retaliatory manner. King v. Ford Motor Co., 872 F.3d 833, 842 (7th Cir. 2017) (citing Arizanovska v. Wal–Mart Stores, Inc., 682 F.3d 698, 703 (7th Cir. 2012) ("The 'similarly-situated' inquiry is a 'flexible, common-sense one,' but it at least requires that the plaintiff name a comparator outside her protected class.")).

Finally, plaintiff's allegations of a discriminatory motive are undermined by the fact that she does not claim to have suffered an adverse employment action until at least 2017, more than five years after she filed her discrimination complaint. As the Court of Appeals

for the Seventh Circuit has observed, large gaps in time between the protected activity and the adverse action "tend to undermine rather than support any inference of causation." King, 872 F.3d at 842 (discussing gap of approximately nine months). Moreover, plaintiff continued to work for defendant for another seven months after she filed and dismissed her discrimination complaint, and her position ended only because the project was nearing completion.

## C. Conclusion

In sum, plaintiff's evidence is not sufficient to permit a reasonable jury to conclude that defendant would have rehired her but for her January 2012 discrimination complaint. Defendant has presented ample evidence that it had good-faith reasons for not hiring plaintiff in 2018, and plaintiff has failed to provide evidence that these reasons were merely pretextual. Therefore, defendant is entitled to summary judgment with respect to plaintiff's retaliation claim.

ORDER

IT IS ORDERED that defendant J.H. Findorff & Son, Inc.'s motion for summary judgment, dkt. #10, is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 2d day of April, 2020.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge